IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

```
─────────────────────────────────────────────
DONNA MICHELE DAVIS,           )
                               )
     Plaintiff,                )
                               )
v.                             )     No. 23-cv-02314-MSN-tmp
                               )
KILOLO KIJAKAZI,               )
ACTING COMMISSIONER OF SOCIAL  )
SECURITY ADMINISTRATION,       )
                               )
     Defendant.                )
─────────────────────────────────────────────
```

## REPORT AND RECOMMENDATION
─────────────────────────────────────────────

On May 17, 2023, Donna M. Davis filed a Complaint seeking judicial review of a Social Security decision. (ECF No. 1.) Davis seeks to appeal a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Title XVI disability benefits. (Id.) This case was referred to the undersigned on December 6, 2023. (ECF No. 22.) For the following reasons, it is recommended the decision of the Commissioner be affirmed.

## I. PROPOSED FINDINGS OF FACT

On December 18, 2017, Davis protectively filed an application for a period of disability and disability insurance benefits under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1385, for supplemental security income. (ECF No. 1 at PageID 1;

ECF No. 16 at PageID 1855.) The application, which alleged an amended onset date of December 18, 2017, was denied initially following a hearing before an administrative law judge ("ALJ"). (R. at 14.) On appeal, the Appeals Council remanded the decision for additional consideration by the ALJ. (R. at 323.) After two additional hearings and consideration of the record and the testimony given at the hearings, the ALJ used the five-step analysis to conclude that Davis was not disabled. (R. at 40.)

At the first step, the ALJ found that Davis has not engaged in substantial gainful activity since the alleged onset date of December 18, 2017. (R. at 17.) At the second step, the ALJ concluded that Davis had the following severe impairments: "depression; anxiety; degenerative joint disease in the shoulder, with right shoulder impingement; degenerative joint disease of the knees; degenerative disc disease." (Id.) In making this determination, the ALJ also considered a number of other conditions Davis alleged. (R. at 18.) Regarding her history with thyroid cancer, the ALJ explained:

> A biopsy revealed right lymph node positive for metastatic papillary thyroid cancer. [Davis] underwent a total thyroidectomy and right lateral neck dissection on June 11, 2018. On follow up, [Davis] was noted to have been doing well and her drain was removed. The most recent medical evidence from Obion County Health Department dated November 2019 showed that [Davis] had normal thyroid levels, according to laboratory reports. [Davis] reported that she had been to the Kirkland Cancer Center in November 2018 for a check on her thyroid cancer status and it was good. She stated that she went to

> Kirkland Cancer Center for her medications. There were
> no records from the cancer center to support [Davis]'s
> allegations. Nonetheless, laboratory reports from the
> health department indeed show that [Davis]'s cancer was
> in remission, as she had normal thyroid levels. [Davis]
> was treated in the emergency department at Jackson
> Madison County General Hospital in August 2019 with
> complaints of a sore throat; however, diagnostic studies
> showed enlarged tonsils. [Davis] has not provided
> evidence that her thyroid cancer has returned or that
> she has experienced residuals from cancer or treatment,
> which is consistent with the laboratory studies.

(Id.) (internal citations omitted). Regarding her history with

uterine cancer, the ALJ explained:

> [W]hile [Davis] also reported uterine cancer in the
> remote past, there was no metastasis or other sequalae
> associated with this resolved condition, and [Davis] did
> not have any chemotherapy to explain her alleged
> weakness, only radiation therapy. In all intents, she is
> post cancer and recovered, with no ongoing functional
> limitations related to this history, and in this regard,
> the [ALJ] considered [Davis]'s acquired hypothyroidism,
> but finds it to be nonsevere. While untreated
> hypothyroidism can cause ailments such as heart
> problems, myxedema, and goiter, the record does not
> document any complaints related to hypothyroidism, which
> is treated by medication. The record documents no
> ongoing complaints of sluggishness, cold sensitivity,
> depression, forgetfulness, constipation, unrelated to
> excessive Pepto-Bismol use, or dry hair and skin that
> would be associated with uncontrolled hypothyroidism,
> nor does the evidence reveal any significant weight
> gain. Accordingly, the [ALJ] finds that [Davis]'s
> hypothyroidism does not impose any vocational
> limitations.

(Id.) (internal citations omitted). The ALJ's evaluation of

Davis's remaining non-severe alleged conditions was similarly

thorough and explained. (See R. at 19-21.) For example, Davis

- 3 -

alleged that she suffered from chronic obstructive pulmonary
disease ("COPD").

> Records from Obion County Health Department show that
> [Davis] had a diagnosis of COPD. However, the overall
> evidence fails to show that [Davis] experienced
> exacerbations consistent with ongoing complaints of
> COPD, and the record does not contain pulmonary function
> tests. Additionally, the most recent medical evidence
> shows that [Davis]'s lung and respiratory examination
> was within normal limits. At the same examination, it
> was noted that [Davis] continued to smoke six to seven
> cigarettes per day. The treatment record noted that
> [Davis] did not wish to stop smoking. Counseling and
> referral was provided for smoking cessation. [Davis]'s
> COPD has not required hospitalization nor does the
> evidence reveal that [Davis] takes medication on a
> regular basis to control COPD symptoms. In a Function
> Report completed by [Davis], she stated that she
> ventured outside several times a day to get "fresh air".
> Thereby, it does not appear that [Davis] was impaired by
> any exposure to outside pulmonary irritants. In the
> Function Report, [Davis] alleged that she performed some
> household work. However, she did not state that she had
> problems with household cleaning agents. Although
> [Davis] alleged that she was limited in walking, she
> said that it was due to pain because of a calcium
> deficiency. Therefore, based on the objective evidence,
> the [ALJ] concludes that [Davis]'s COPD does not cause
> greater than minimal limitations on her ability to
> perform work related activities. Therefore, the [ALJ]
> has concluded that [Davis]'s COPD is nonsevere.

(R. at 19) (internal citations omitted). Davis also alleged
disabling heart failure, but the ALJ found that

> her ejection fraction of 55-60% affirmatively
> establishes the absence thereof. The [ALJ] recognizes
> occasionally abnormal electrocardiogram studies in the
> medical evidence of record, and has fully considered
> cardiac allegations in determining [Davis] to be limited
> to less than the full range of light exertion work, but
> finds that the evidence is insufficient to establish any
> "severe" cardiac or cardiovascular impairment. The [ALJ]
> further notes age undetermined septal infarct with T-

- 4 -

> wave abnormalities in March 2018. Although this evidence
> is less than definitive proof and is not accompanied by
> documented ongoing reports of cardiac symptoms, there is
> a somewhat increased possibility of ischemic heart
> disease, which has been fully considered in limiting
> [Davis] to the reduced range of light work described
> below.

(Id.) (internal citations omitted). The ALJ made similar, non-severe findings regarding Davis's alleged rheumatoid arthritis, gastroesophageal reflux disease, and headaches. (R. at 19–20.)

At the third step, the ALJ concluded that Davis's impairments did not meet or medically equal, either alone or in the aggregate, the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.) Accordingly, the ALJ had to next determine whether Davis retained the residual functional capacity ("RFC") to perform past relevant work or could adjust to other work. The ALJ found that Davis could:

> perform light work as defined in 20 CFR 416.967(b) except
> frequently reach, handle, and finger bilaterally;
> occasionally climb, balance, kneel, stoop, crouch, and
> crawl; and tolerate occasional exposure to workplace
> hazards and concentrated pulmonary irritants such as
> cleaning solution and industrial dusts. She could have
> no more than two hours of concentration without a break
> in an environment with occasional changes and having
> only occasional contact with the general public.

(R. at 25.) Pursuant to 20 C.F.R. § 404.1567(b), light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Additionally, light work includes jobs that "[r]equire a good deal of walking or standing, or involve[] sitting most of the time with

- 5 -

some pushing and pulling of arm or leg controls." 20 C.F.R. §
404.1567(b).

In reaching the RFC determination, the ALJ discussed Davis's
testimony and the medical evidence in the record. The ALJ
summarized Davis's testimony as follows:

> [Davis] testified that she sometimes sleeps for days at
> a time. She stated that she has numbness in her hands
> that has persisted for a couple of years. [Davis]
> testified her feet are numb and she sometimes
> experiences the sensation of walking on coals. She
> stated since receiving a diagnosis of thyroid cancer,
> she feels bad daily, and at the May 2021 hearing,
> [Davis]'s representative mentioned [Davis] has cervical
> and lumbar radiculopathy and degenerative joint disease
> affecting both shoulders. At the more recent hearing, it
> was argued that [Davis] has fatigue and weakness
> prohibiting work, although [Davis] did not have
> chemotherapy that would cause neuropathy or other
> symptoms as reported, nor does the medical evidence of
> record support any other etiology for these symptoms.
> The representative argued that Dr. Mitchell missed that
> [Davis] has right-sided rotator cuff tear that seems
> very severe, and it was agreed that more evidence would
> be obtained prior to issuing a new decision.

(R. at 26) (internal citation omitted). The ALJ concluded that
Davis's "medically determinable impairments could reasonably be
expected to cause the alleged symptoms; however, [Davis]'s
statements concerning the intensity, persistence and limiting
effects of these symptoms are not entirely consistent with the
medical evidence and other evidence in the record . . . ." (Id.)

The ALJ made the following findings regarding Davis's mental
conditions:

On the Function Report, [Davis] alleged that she could
not handle stress well, and that she was always stressed
out. [Davis] also reported that she did not like change
and that she did not handle changes in routines well.
[Davis] alleged that she had received treatment from
Pathways, those records were not included in the record.
Nonetheless, records from [Davis]'s Obion County Health
Department showed that [Davis] was diagnosed with
depression and anxiety. Additionally, near the alleged
onset date, records from Baptist Memorial Hospital Union
City from July 15, 2016, indicated that [Davis]'s mood
appeared anxious, speech was rapid and/or pressured, and
she was noted to be agitated. The medical staff noted
that [Davis]'s thought content was paranoid, and [Davis]
expressed impulsivity and inappropriate judgment in the
middle of experiencing a health-related concern with
accompanying anxiety attack. She later behaved similarly
on one occasion in October 2021 when frustrated that she
was not getting desired care, causing Jackson Purchase
Primary Clinic to determine it would be better if [Davis]
sought care elsewhere given concerns of malingering and
noncompliance with medical care.

(R. at 26–27) (internal citations omitted). The ALJ then detailed

the results of each of several additional psychological doctors'

visits and evaluations, finding that Davis's "allegations of

disabling psychiatric symptoms are poorly supported and

inconsistent with the longitudinal record." (R. at 27–28.)

Regarding her physical impairments, and specifically her

shoulder conditions, the ALJ explained:

The record supports "severe" physical impairments of
degenerative disc disease and degenerative joint disease
of the right shoulder with right shoulder impingement.
Imaging showed unspecified cervical degenerative disc
and joint disease in [Davis]'s neck. At this juncture,
the [ALJ] specifically notes the medical evidence of
record shows normal deep tendon reflexes, sensation, and
coordination with no sensory deficits or impairment in
coordination. Spurling's signs were negative. These
findings are inconsistent with stenosis or other spinal

pathology that could reasonably limit [Davis] beyond the
exertional range found herein subject to the limitations
set forth in the residual functional capacity.

In September 2021, right shoulder radiographs proved
negative by one report, but Dr. Puneet Bhatia in
September 2021 reviewed radiographs and stated imaging
showed moderate acromioclavicular arthritis with distal
clavicle bone spur and subacromial type 2 acromion
without significant glenohumeral arthritis. At Dr.
Bhatia's examination, the physician documented signs of
rotator cuff impingement syndrome of the shoulder with
intact gross sensation and power. During an emergency
room visit on October 4, 2021, [Davis] identified
levothyroxine as her only home medication. She denied
pain with movement or with rest upon examination of her
neck and she exhibited full range of motion with no
swelling and full extremity strength. On October 22,
2021, MRI imaging identified no rotator cuff tear but
showed some shoulder effusion with increased signal
along the superior labrum suggesting a possible tear,
with only mild arthritic changes, and this imaging was
considered in light of the record as a whole in
determining a severe shoulder impairment has been
demonstrated.

(R. at 29) (internal citations omitted). The ALJ also considered

the medical record associated with Davis's alleged knee problems,

finding that:

As for allegations of degenerative joint disease of the
knees, left tibia-fibula x-rays showed no abnormalities
in 2018. She only rarely reported any issues with knee
pain and by report, a nuclear medicine bone scan showed
degenerative activity in the shoulders, spine, and knees
as of June 2020. However, she did not seek any care for
knee related issues, specifically during the period at
issue. Furthermore, the record does not contain the
actual radiographic imaging or report of specific knee
related findings regarding degenerative activity, but
given her consistently normal gait, the absence of
crepitus, heat, and warmth in the knees, and the absence
of overall complaints regarding knee related issues, it
would be speculative indeed to conclude that [Davis] has
advanced osteoarthritis of the knees bilaterally.

- 8 -

(Id.) (internal citations omitted). As for her neck and joints, the ALJ evaluated the record of examinations, noting that:

> Providers frequently noted no signs of physical distress. As of March 2021, she reported improved low back and hip pain and her provider noted [Davis] could use Motrin or Tylenol for reports of shoulder pain and instructed [Davis] to do range of motion exercises. However, it is important to note that in March 2021, [Davis] denied joint pain, osteoarthritis, muscle weakness, decreased range of motion, abnormal gait, motor weakness, and sensory problems. She continued to exhibit normal strength, gait, neurological findings, and denied pain with movement in 2021, as well.

(R. at 30) (internal citations omitted). The ALJ similarly considered the record of Davis's alleged fatigue, finding that:

> the record does not reveal objective clinical signs such as muscle atrophy, gait disturbance, or impaired motor strength that would tend to support an inability to perform the range of work anticipated by the residual functional capacity given even occasional intermittent or more regular complaints of fatigue to the extent such complaints are just not documented in the record. After careful review of the record and including complaints of subjective symptoms such as fatigue and pain, the [ALJ] finds [Davis] is able to perform a reduced range of light exertion work in which she can frequently reach, handle, and finger bilaterally. She is able to climb, balance, kneel, stoop, crouch, and crawl on an occasional basis, while tolerating occasional exposure to workplace hazards and concentrated pulmonary irritants such as cleaning solution and industrial dusts.

(Id.)

The ALJ recognized that the case had been previously remanded because the "objective evidence" in Dr. Collier's report had not been discussed in the initial determination. (R. at 31.) As the ALJ explained, Davis's representative sent Davis and her records

- 9 -

to local practicing Internal Medicine specialist Stephen
Collier, MD, for a record review, examination and report
to include a Medical Source Statement. Dr. Collier
provided his examination office note, list of records
reviewed and a Medical Source Statement of Ability to do
Work-Related Activities (Physical). After reviewing the
record and examining [Davis], Dr. Collier confirmed the
diagnoses of Degenerative Disc Disease, Generalized
Osteoarthritis, History of Malignant Neoplasm of
Thyroid, Hypothyroidism and Bilateral Carpal Tunnel
Syndrome. He noted "history of chronic back pain
secondary to degenerative disease and generalized
arthritis . . . has a lot of severe low back pain..
bilateral sciatica, numbness, tingling runs down her leg
. . . generalized fatigue, malaise and weakness chronic
dull ache and stiffness, difficulty getting out of a
chair . . . probably cannot walk more than 50 feet
without stopping to rest . . . bilateral hips and knees
also give her trouble." His examination revealed mildly
positive straight leg raising and moderate paraspinal
spasm L3-S1, bilateral pain to palpation of sciatic
notch and sacroiliac, and bilateral positive Tinel's and
Phalen's signs. Dr. Collier provided a Medical Source
Statement of Ability to do Work-Related Activities
(Physical). He opined that [Davis] could: lift and/or
carry up to 10 pounds occasionally and less frequently:
stand/walk at least 2 hours and sit about 6 hours in an
8-hour workday, with the need to alternate sitting and
standing: push and pull limited in upper extremities due
to generalized osteoarthritis and lumbar degenerative
disc disease causing chronic pain and stiffness, and by
carpal tunnel syndrome; never climb, balance, kneel,
crouch, crawl or stoop (up to 1/3 of a workday). Dr.
Collier opined that reach, handle, finger and feel would
all be limited to occasional because of generalized
osteoarthritis and carpal tunnel syndrome. He felt that
attention and concentration would be significantly
compromised by anxiety. He found that [Davis] should
never be exposed to temperature extremes, noise, dust,
vibration, humidity/wetness, hazards or pulmonary
irritants. Based on his examination and review of
[Davis]'s medical records, it was Dr. Collier's opinion
that these limitations were first present in July 2016.
Dr. Collier is board-certified in internal medicine, and
reportedly perform some record review, through the date
of his opinion in October 2019.

(Id.) (internal citation omitted). The ALJ objected to the Appeals
Council's inclusion of the results of Davis's straight-leg
raising, Tinel's, and Phalen's tests as objective evidence because
"these results are not genuine objective evidence but merely an
examinee's subjective response to a specific maneuver. The
undersigned specifically notes that the record contains no other
positive straight-leg raising, Tinel's or Phalen's results." (R.
at 32.) The ALJ likewise noted that in Dr. Collier's report, there
is a "conspicuous absence of any objective evidence (such as x-
ray or MRI evidence of spinal or joint pathology to document the
existence of disc disease or osteoarthritis) or nerve conduction
studies or at least clinical findings of thenar muscle atrophy to
provide some form of objective proof of carpal tunnel syndrome."
(Id.) The ALJ discussed at length several additional
inconsistencies and contradictions in Dr. Collier's diagnoses.
(Id.)

        The ALJ also considered the report of Dr. Janovich, sought
out by Davis's representative in 2021 for an independent medical
examination. (Id.)

> He examined [Davis] in April 2021, at which time she
> endorsed complaints of neck pain, right upper extremity
> pain, back pain, right hip pain, episodic numbness in
> the right upper extremity, difficulty sitting, and
> restricted range of motion in the right shoulder. Dr.
> Janovich on clinical examination noted unknown degree of
> limited range of motion in the neck with marked
> tenderness over the right paracervical muscles, over the
> trapezial trigger point, and over the supraspinatus

- 11 -

muscle on the right with diminished grip strength in the right hand. He also noted mild increased tone in the right paralumbar muscles, with marked tenderness over the sciatic nerve at the notch and positive sciatic stress testing on the right. [Davis] had no abnormalities involving the lower extremities per observation of this physician. He noted right shoulder abduction to 40° with positive Hawkins test involving the right shoulder. His diagnostic impressions were of cervical radiculopathy, partial right rotator cuff tear, lumbar radiculopathy, incompatible with the intact sensation to the feet bilaterally noted earlier in his report, and right sided sciatica, with non-orthopedic diagnoses of COPD, cardiomyopathy, metastatic thyroid carcinoma, and depression.

(R. at 32–33) (internal citation omitted). Dr. Janovich's resulting RFC for Davis was that she:

cannot lift and carry 10 pounds, stand/walk 2 hours, or sit 6 hours in an 8-hour workday, with limited pushing and pulling in all extremities, no ability to climb ramps, stairs, ladders, ropes, or scaffolds, and no ability to crouch or crawl, with the ability to occasionally balance, kneel, and stoop. He assessed [Davis] to be capable of unlimited fine manipulation, but with "limited" ability to reach in all directions, handle, and feel, which he felt [Davis] could do on an occasional basis only. He rated [Davis] as having limited ability to perform visual tasks while providing absolutely no explanation for such limitation. He also indicated [Davis] had "limited" ability to tolerate temperature extremes, noise, dust, vibration, humidity/wetness, hazards, and pulmonary irritants such as fumes, odors, chemicals, and gases, due in part to COPD, cardiomyopathy, anxiety, and metastatic thyroid cancer, and all these conditions fall outside the area of his clinical specialty, which is orthopedics.

(R. at 33) (internal citations omitted). Given the objective evidence in the record, ALJ found this evaluation unpersuasive. (Id.) He explained that

- 12 -

Dr. Janovich limits pushing and pulling with the lower
extremities, but stated he found no abnormalities with
the lower extremities that would tend to support a need
for such limitations. He noted a limitation of the neck
on rotation and bending, which is inconsistent with the
record where she was seeking treatment, such as where
she denied limitations relating to the neck and
exhibited normal range of motion. It appears that he may
have over relied upon [Davis]'s subjective reports of
pain or self-limited maneuvering at this one-time
examination given the discrepancy between findings he
set forth that date and findings set forth by [Davis]'s
actual care providers. While he may have felt the
proposed limitations reasonable given the objective
clinical findings that date, the [ALJ] is tasked in
evaluating opinion evidence in light of consistency with
the record as a whole, and the record as a whole fails
to demonstrate that [Davis] had these abnormal clinical
findings on a regular basis. As of March 2021, [Davis]
reported improved low back and hip pain and her provider
noted [Davis] could use Motrin or Tylenol for reports of
shoulder pain and instructed [Davis] to do range of
motion exercises., it is [sic] Also in March 2021,
[Davis] denied joint pain, osteoarthritis, muscle
weakness, decreased range of motion, abnormal gait,
motor weakness, and sensory problems. She continued to
exhibit normal strength, gait, neurological findings,
and denied pain with movement in 2021, as well. These
objective findings do not support Dr. Janovich's
extremely limiting opinion, although recommendations
regarding limitations were fully considered, and the
[ALJ] does find the record sufficient to support some
postural and environmental limitations as well as some
limitations involving reaching, handling, and fingering
within the range of light exertion work.

(R. at 33–34) (internal citations omitted). In further support of

his finding as being unpersuasive that Davis is completely unable

to sit, stand, or walk consistent with a light work RFC, the ALJ

found parts of Dr. Janovich's report internally inconsistent.

Nonetheless, the ALJ did note that Dr. Janovich's report was:

partially persuasive in terms of [Davis]'s ability to
occasionally climb, balance, kneel, stoop, crouch, and
crawl, rather than findings she is capable of frequently
or constantly doing any of these activities, but the
overall evidence does not support his proposed
prohibition on crouching, crawling, and any climbing,
including ramps and stairs due to any combination of
symptoms. The [ALJ] has considered his opinion partially
persuasive in terms of ability to tolerate occasional
exposure to workplace hazards and concentrated pulmonary
irritants and in terms of having some limitations,
handling and fingering, although the record as a whole
supports the ability to frequently reach, handle, and
finger bilaterally despite any shoulder-related or
neurological issues undocumented or unsupported by the
objective clinical findings described in the medical
evidence of record, particularly given the absence of
sustained limitations in range of motion, evidence of
chronic atrophy or decreased strength, etc.

(R. at 34.)

The ALJ also considered and found as being unpersuasive the
opinions of state agency consulting evaluators Dr. Marvin
Bittinger and Dr. Rita Misra. (R. at 34–35.) The ALJ rejected their
findings that Davis's physical limitations were non-severe,
partially because they were from several years prior, but more
generally because the objective medical evidence "reasonably
support[s] that [Davis] has severe physical issues, limiting her
to a range of light work . . . ." (Id.) The ALJ also extensively
reviewed the opinions of state agency mental examiners Dr. Marvin
Blasé and Dr. Robert De la Torre. (R. at 35–36.) The ALJ found:

These clinicians have extensive program knowledge
related to disability and reviewed some of the available
evidence. They cited some objective clinical findings in
support of their assessments and their opinions are
partially persuasive. However, the proposed mental

residual functional capacity contains vague language and
uses terms that are not defined by the Social Security
Administration. As such, the opinion is not fully
persuasive. Notwithstanding the above, the [ALJ] finds
their opinions persuasive in determining that [Davis]
can adapt to occasional workplace changes and have
occasional contact with the public, while reconciling
other vague language to include no need for restricting
[Davis]'s ability to interact appropriately with
supervisors or coworkers. The absence of significant
cognitive and/or memory deficits does not support a need
to specifically limit [Davis] to simple or detailed
tasks, but the [ALJ] notes that the jobs identified by
the vocational expert at step 5 of the sequential
evaluation process can be mastered within 30 days, and
involve repetitive, short cycle work with very low
social demands, consistent with greater limitations
suggested by the wordy opinions of the state agency
consultant. Vague phrases such as "although a more
flexible and low demand work environment would be
preferable" it would not be "required," "rare intrusion
of psychological symptoms" and "sufficiently handle
interaction" do not clearly support any specific ability
to perform tasks occasionally, frequently, constantly,
or never. The [ALJ] has reviewed the totality of the
evidence, including opinion evidence, and objective
clinical findings in determining limitations set forth
in the mental residual functional capacity while relying
upon the step 5 sequential evaluation process findings
to provide evidence of the large number of jobs available
to an individual with said limitations.

(Id.) The ALJ also considered the opinion of Dr. Carl Gilleylen,

who found that Davis "has mild to moderate functional limitations

as discussed particular in the B criteria analysis . . . ." The

ALJ explained that:

Dr. Gilleylen performed a one-time consultative
examination in the area of his clinical expertise that
appears consistent with the conclusions drawn therein.
He did not offer a specific assessment regarding
[Davis]'s ability to carry out work-related tasks,
although he did specify that [Davis] appeared able to
follow instructions, both written and spoken despite

- 15 -

moderate impairment in social relating, and ability to
adapt to changes. His opinion is highly persuasive in
developing the B criteria as it is consistent with the
record as a whole, which fails to document signs of
significant distractibility or inattention, as well as
failing to document any concerns regarding memory or
cognitive impairment inconsistent with the conclusions
drawn herein. His opinion is also persuasive in
determining that [Davis] is able to follow written and
spoken instructions, but as he did not specifically
quantify a residual functional capacity assessment in
terms of simple or detailed tasks, etc., his opinion is
only partially persuasive.

(R. at 36) (internal citations omitted).

The ALJ then considered Davis's symptoms. He noted that the
Commissioner "does not assess a claimant's credibility, but
rather, assesses whether the medical and other evidence supports
a claimant's statements of symptoms." (Id.) (citing SSR 16-3p,
2017 WL 5180304 (Oct. 25, 2017)). However, he also suggested that
"less frequent or intense treatment, or failure to follow treatment
may be a basis for a finding of inconsistency" before he discussed
Davis's recorded non-compliance with medical treatment in 2021.
(R. at 36-37.)  The ALJ summed up his ultimate opinion as follows:

[Davis]'s statements about the intensity, persistence,
and limiting effects of his or her symptoms, they are
inconsistent because the medical evidence of record does
not support the extreme degree of debility alleged. The
[ALJ] notes that [Davis]'s medical evidence does not
generally document the frequency or severity of
[Davis]'s symptoms. As noted above, [Davis] rarely
demonstrated any reduction in range of motion in the
neck, back, shoulders, or knees, and she consistently
demonstrated normal gait and strength, with no evidence
of muscle atrophy. Imaging has shown some abnormalities,
but nothing that has prompted particular concern of need
for orthopedic management or neurological intervention.

- 16 -

She generally demonstrated normal range of motion with
no signs of distress, as well as demonstrating normal
coordination, strength, gait, and neurological findings.
Reports of pain made to one-time examiners for purposes
of generating an opinion are not the same as the
objective clinical signs, and although [Davis] had
decreased range of motion when meeting with Dr. Janovich
and Dr. Collier, it is notable that when she sought
actual medical care, the objective clinical findings did
not support the irregularities noted by Dr. Janovich or
Dr. Collier, nor does the medical evidence of record
support signs of positive straight leg raising or
unilaterally decreased reflexes, consistent with spinal
stenosis or other pathology that could cause chronic,
disabling pain of a spinal origin. [Davis] only
mentioned knee pain on less than 5 occasions during the
period at issue, and her shoulder pain appears to have
been right-sided versus bilateral for the most part,
with rare mention of shoulder issues until 2021 and
almost exclusively normal range of motion that does not
rise to the level of limiting reaching beyond a frequent
basis. While her neck appears to have bothered her
intermittently, the record does not contain clinical
signs documenting factors such as persistent weakness,
numbness, tingling, or impaired coordination that would
support an inability to frequently handle and finger
bilaterally, or perform the other tasks consistent with
the light residual functional capacity adopted herein.
Moreover, reports of psychological issues have been rare
and unaccompanied by persistent signs of anxiety or
depression consistent with an impairment rendering an
individual incapable of meeting the demands of the jobs
identified at step 5 of the sequential evaluation
process. As there are a substantial number of jobs
identified by the vocational expert that [Davis] can
perform, an unfavorable finding is warranted.

Given the vocational expert testimony and in light of
both the medical evidence of record and the testimony in
this case, the [ALJ] finds the record supports the
conclusions drawn herein. Based on the foregoing, the
[ALJ] finds [Davis] has the above residual functional
capacity assessment, which is supported by the record as
a whole.

(R. at 37-38.)

- 17 -

At the fourth step, the ALJ determined that Davis has "no past relevant work." (R. at 38.) The ALJ detailed several jobs Davis had, but found that her "work as a bartender, [certified nursing assistant], and hairstylist fail to meet the past relevant work criteria." (Id.) At the fifth step, the ALJ concluded that, given Davis's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Davis] can perform." (Id.) At the hearing, the vocational expert ("VE") testified that, even given the limitations in her RFC, Davis could perform the jobs of "assembler," "Marker," and "Photocopy machine operator," each of which the VE testified represents a substantial number of jobs in the national economy even when accounting for Davis's RFC. (R. at 39.) The ALJ found "that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles except where this publication and its attendant publications are silent or ambiguous. In those areas, the vocational expert relied upon education, training, and experience in offering the testimony . . . ." (Id.) The ALJ therefore concluded that Davis "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and found her "not disabled." (R. at 40.)

On June 1, 2022, the ALJ issued a decision detailing the findings summarized above. The Appeals Council denied Davis's

request for review. (R. at 1.) Davis now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner under § 1631(c)(3) of the Act. On appeal, Davis argues that the ALJ incorrectly evaluated her impairments at step two, erred in the determination of Davis's RFC, and should reverse the ALJ's decision for payment of benefits.

## II. PROPOSED CONCLUSIONS OF LAW

### A.   Standard of Review

Under 42 U.S.C. § 405(g), a claimant may obtain judicial review of any final decision made by the Commissioner after a hearing to which he or she was a party. "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Judicial review of the Commissioner's decision is limited to whether there is substantial evidence to support the decision and whether the Commissioner used the proper legal criteria in making the decision. Id.; Cardew v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir. 2018); Cole v. Astrue, 661 F.3d 931, 937 (6th Cir. 2011); Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Kirk v. Sec'y of Health &

Human Servs., 667 F.2d 524, 535 (6th Cir. 1981) (quoting Richardson v. Perales, 402 U.S. 389 (1971)).

In determining whether substantial evidence exists, the reviewing court must examine the evidence in the record as a whole and "must 'take into account whatever in the record fairly detracts from its weight.'" Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990) (quoting Garner v. Heckler, 745 F.2d 383, 388 (6th Cir. 1984)). If substantial evidence is found to support the Commissioner's decision, however, the court must affirm that decision and "may not even inquire whether the record could support a decision the other way." Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (quoting Smith v. Sec'y of Health & Human Servs., 893 F.2d 106, 108 (6th Cir. 1989)). Similarly, the court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. Ulman v. Comm'r of Soc. Sec., 693 F.3d 709, 713 (6th Cir. 2012) (citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007)). Rather, the Commissioner, not the court, is charged with the duty to weigh the evidence, to make credibility determinations, and to resolve material conflicts in the testimony. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 528 (6th Cir. 1997); Crum v. Sullivan, 921 F.2d 642, 644 (6th Cir. 1990).

**B.    The Five-Step Analysis**

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months." 42 U.S.C.
§ 423(d)(1). Additionally, section 423(d)(2) of the Act states
that:

> An individual shall be determined to be under a
> disability only if his physical or mental impairment or
> impairments are of such severity that he is not only
> unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any
> other kind of substantial gainful work which exists in
> the national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether
> he would be hired if he applied for work. For purposes
> of the preceding sentence (with respect to any
> individual), "work which exists in the national economy"
> means work which exists in significant numbers either in
> the region where such individual lives or in several
> regions of the country.

Id. § 423(d)(2). Under the Act, the claimant bears the ultimate
burden of establishing an entitlement to benefits. Oliver v. Comm'r
of Soc. Sec., 415 F. App'x 681, 682 (6th Cir. 2011). The initial
burden is on the claimant to prove she has a disability as defined
by the Act. Siebert v. Comm'r of Soc. Sec., 105 F. App'x 744, 746
(6th Cir. 2004) (citing Walters, 127 F.3d at 529); see also Born
v. Sec'y of Health & Human Servs., 923 F.2d 1168, 1173 (6th Cir.
1990). If the claimant is able to do so, the burden then shifts to
the Commissioner to demonstrate the existence of available
employment compatible with the claimant's disability and

background. <u>Born</u>, 923 F.2d at 1173; <u>see also</u> <u>Griffith v. Comm'r of</u>
<u>Soc. Sec.</u>, 582 F. App'x 555, 559 (6th Cir. 2014).

Entitlement to social security benefits is determined by a
five-step sequential analysis set forth in the Social Security
Regulations. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920. First, the
claimant must not be engaged in substantial gainful activity. <u>See</u>
20 C.F.R. §§ 404.1520(b), 416.920(b). Second, a finding must be
made that the claimant suffers from a severe impairment. 20 C.F.R.
§§ 404.1520(a)(4)(ii), 416.920(a)(5)(ii). In the third step, the
ALJ determines whether the impairment meets or equals the severity
criteria set forth in the Listing of Impairments contained in the
Social Security Regulations. <u>See</u> <u>id.</u> §§ 404.1520(d), 404.1525,
404.1526. If the impairment satisfies the criteria for a listed
impairment, the claimant is considered to be disabled. On the other
hand, if the claimant's impairment does not meet or equal a listed
impairment, the ALJ must undertake the fourth step in the analysis
and determine whether the claimant has the RFC to return to any
past relevant work. <u>See</u> <u>id.</u> §§ 404.1520(a)(4)(iv), 404.1520(e). If
the ALJ determines that the claimant can return to past relevant
work, then a finding of "not disabled" must be entered. <u>Id.</u> But if
the ALJ finds the claimant unable to perform past relevant work,
then at the fifth step the ALJ must determine whether the claimant
can perform other work existing in significant numbers in the
national economy. <u>See</u> <u>id.</u> §§ 404.1520(a)(4)(v), 404.1520(g)(1),

416.960(c)(1)-(2). Further review is not necessary if it is determined that an individual is not disabled at any point in this sequential analysis. Id. § 404.1520(a)(4).

## C.    The ALJ's Step Two Analysis

Davis argues that the ALJ erred by not finding that certain impairments she alleged were severe. (ECF No. 16 at PageID 1864.) Additionally, she contends more generally that the ALJ improperly discounted the opinions of Dr. Collier and Dr. Janovich. (Id. at PageID 1861-63.) She points to the doctors' findings, who each found a number of additional severe impairments that she says the ALJ gave "short shrift," unfairly penalizing her for lacking insurance and not getting additional treatment. (Id.) The government responds that Davis's arguments are unsupported because they are, at best, "simply a wish that the ALJ had weighed the evidence differently . . . ." (Id. at PageID 1878) (citing Ulman, 693 F.3d at 714 ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess.")).

The ALJ here created a lengthy record, giving due consideration to each of Davis's alleged impairments in evaluating their severity. The ALJ explained that Davis's ejection fraction results do not align with a diagnosis of congestive heart failure. (R. at 19, 877.) Further, although the ALJ did mention that the "record does not contain pulmonary function tests" that might

suggest additional limitations from COPD, her inability to get such tests was irrelevant because "[Davis]'s lung and respiratory examination was within normal limits." (R. at 19, 1256, 1262.) With carpal tunnel syndrome, the ALJ found that on numerous occasions Davis did not have issues with manipulation, and in 2021, "she denied numbness/tingling, and neurological examinations failed to yield abnormalities and assessments failed to include carpal tunnel syndrome." (R. at 21, 1327, 1329, 1801, 1811.) For each of Davis's alleged conditions, the ALJ gave a thoughtful and reasoned analysis before finding whether or not it qualified as an impairment for the purposes of the five-step analysis. In fact, the ALJ went so far as to include a number of limitations in the RFC even where he did not find impairments, including manipulative limitations designed to ensure she could do jobs even with her alleged carpal tunnel.

The ALJ also gave significant and sufficient consideration to the evaluations of Dr. Collier and Dr. Janovich. For example, he dismissed Dr. Collier's carpal tunnel diagnosis as unsupported after explaining that the testing he performed was subjective and "[c]onspicuously absent are electrodiagnostic tests confirming carpal tunnel syndrome." (R. at 21.) He explained that Dr. Janovich's report could not support a carpal tunnel diagnosis because he "fail[ed] to evaluate [Davis]'s hands, his orthopedic diagnoses did not encompass carpal tunnel syndrome, and an

assessment reflects that her ability to perform (fine manipulation) was unlimited." (Id.) In effect, Davis here seeks the undersigned to re-weigh the objective medical evidence, which is not this court's role. There is substantial evidence to support the ALJ's step two findings.

**D.   Davis's RFC**

Davis argues several issues related to her RFC. First, she argues that the ALJ erred by relying on non-examining state agency medical findings based on her reading of the Supreme Court's 1971 decision in Richardson v. Perales, 402 U.S. 389 (1971). (ECF No. 16 at PageID 1865–67.) Second, she argues that the Social Security Administration's ("SSA") 2017 regulatory changes in 2017 were unlawful. She also contends that the ALJ erred in discounting the RFC determinations of Dr. Collier and Dr. Janovich, (id. at PageID 1862–63), but as the undersigned discussed above, the ALJ's finding that the two doctors' reports were unpersuasive is supported by substantial evidence.

As the government correctly points out, Davis misreads Richardson. She insists that Richardson stands for the proposition that "to be substantial evidence, opinions must at least be from examiners." (Id. at PageID 1867.) In Richardson, the Supreme Court was asked to evaluate whether written reports by examining physicians "may be received as evidence in a disability hearing and . . . may constitute substantial evidence supportive of a

finding by the hearing examiner adverse to the claimant . . . ."
Richardson, 402 U.S. at 402. The Court took no issue with the
inclusion of testimony of a non-examining medical adviser. Id. at
408. The government is further correct in pointing to the
regulations: the ALJ must consider "prior administrative medical
findings" in the same way as other medical opinions. 20 C.F.R. §
416.920c(a). These opinions, if found persuasive, can serve as the
basis for an RFC finding.

This court has previously encountered similar arguments
seeking to re-structure the ALJ's considerations in weighing
evidence. In a prior case, the court said the following:

> This court has an extremely limited role in the Social
> Security disability determination process: to evaluate
> whether the ALJ's decision was supported by substantial
> evidence and whether the ALJ used the correct legal
> criteria to make his or her decision. See, e.g., Cardew
> v. Comm'r of Soc. Sec., 896 F.3d 742, 745 (6th Cir.
> 2018). It is not free to restructure the disability
> determination process to suit its policy preferences.
> Similarly, the court generally cannot consider evidence
> outside of the administrative record, such as newspaper
> articles. Miller v. Comm'r of Soc. Sec., 811 F.3d 825,
> 839 (6th Cir. 2016). Under governing regulations, "an
> ALJ is permitted to rely on state agency physician's
> opinions to the same extent as she may rely on opinions
> from other sources." Reeves v. Comm'r of Soc. Sec., 618
> F. App'x 267, 274 (6th Cir. 2015). Governing regulations
> also permit ALJ's to consider program knowledge. 20
> C.F.R. § 404.1527(c)(6). Lucy's objection is not
> supported by law.

Lucy v. Saul, No. 19-1083-TMP, 2020 WL 1318803, at *7 (W.D. Tenn.
Mar. 20, 2020). The ALJ did nothing contrary to law by relying on
the opinions of non-examining physician reports.

Davis goes further, too, suggesting that the SSA's 2017 regulatory changes were an "unlawful major change by SSA attempting to overrule Supreme Court law and congressional action by changing agency regulations." (ECF No. 16 at PageID 1867.) Her argument appears to be that the 2017 SSA regulations improperly abrogated the Richardson decision because the regulations requiring that an ALJ "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources," 20 C.F.R. § 416.920c, do not align with the "Court in Richardson['s holding] that at minimum substantial evidence must be an opinion from an examiner," (ECF No. 16 at PageID 1868).

As previously discussed, the Richardson opinion addresses an entirely different issue, and yet even in that decision, the Court acknowledged that non-examining expert opinions can serve the role of providing substantial evidence to deny a social security claim. Richardson, 402 U.S. at 408 ("We see nothing unconstitutional or improper in the medical adviser concept and in the presence of Dr. Leavitt in this administrative hearing.").

Under the treating physician rule, which was in effect prior to the 2017 regulations' adoption, the SSA was, barring a number of exceptions, to "give more weight to medical opinions from [the claimant's] treating sources . . . ." 20 C.F.R. § 416.927(c)(2).

The government correctly points out that prior to its codification, this rule was a judicial creation designed to fill a regulatory gap. See Schisler v. Sullivan, 3 F.3d 563, 565 (2d Cir. 1993) ("There were . . . no comprehensive administrative regulations concerning the weighing of [treating physician] opinions."). In 1991, the Commissioner officially adopted the rule in an effort to "clarify our policy on the weight to be given treating source opinions." 56 Fed. Reg. 36,932-01, 36,932, 36,934 (Aug. 1, 1991) (specifically referencing Schisler). However, the Commissioner changed course in 2017:

> Since we first adopted the current treating source rule in 1991, the healthcare delivery system has changed in significant ways that require us to revise our policies in order to reflect this reality. Many individuals receive health care from multiple medical sources, such as from coordinated and managed care organizations, instead of from one treating [acceptable medical sources ("AMS")]. These individuals less frequently develop a sustained relationship with one treating physician. Indeed, many of the medical sources from whom an individual may seek evaluation, examination, or treatment do not qualify to be "treating sources" as defined in current 404.1502 and 416.902 because they are not AMSs. These final rules recognize these fundamental changes in healthcare delivery and revise our rules accordingly.
>
> Courts reviewing claims under our current rules have focused more on whether we sufficiently articulated the weight we gave treating source opinions, rather than on whether substantial evidence supports our final decision. As the Administrative Conference of the United States' (ACUS) Final Report explains, these courts, in reviewing final agency decisions, are reweighing evidence instead of applying the substantial evidence standard of review, which is intended to be highly deferential standard to us.

82 Fed Reg. 5844-01, 5853 (Jan. 18, 2017). The only objection Davis
makes against this rule appears to be that it runs contrary to
Supreme Court precedent. "A court's prior judicial construction of
a statute trumps an agency construction otherwise entitled to . .
. deference only if the prior court decision holds that its
construction follows from the unambiguous terms of the statute and
thus leaves no room for agency discretion." Nat'l Cable &
Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982
(2005). The Act requires that the SSA request and consider evidence
from treating physicians, but it does not specify how the agency
should evaluate that evidence, leaving this element of the Act
ambiguous. See 42 U.S.C. § 423(d)(5)(B), 1382c(H)(i); 81 Fed. Reg.
62,560-01, 62,571 (Sept. 9, 2016). The initial judge-made rule was
designed initially to fill a prior gap in agency regulations. See
81 Fed. Reg. at 62,571; Schisler, 3 F.3d at 565. The 1991
regulations were valid in codifying that treating physician rule,
but the 2017 regulations were no less valid for creating a new
rule in its place. Therefore, the undersigned rejects Davis's
challenge to the 2017 SSA regulations.

### III. RECOMMENDATION

For the reasons above, the undersigned recommends that the
decision of the Commissioner be affirmed.

Respectfully submitted,

- 29 -

s/Tu M. Pham
_____
TU M. PHAM
Chief United States Magistrate Judge

December 20, 2023
_____
Date


**NOTICE**

**WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THIS REPORT AND RECOMMENDED DISPOSITION, ANY PARTY MAY SERVE AND FILE SPECIFIC WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS.   ANY PARTY MAY RESPOND TO ANOTHER PARTY'S OBJECTIONS WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY.   28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(2); L.R. 72.1(g)(2).   FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.**